**NOT FOR PUBLICATION WITHOUT THE
APPROVAL OF THE APPELLATE DIVISION**

This opinion shall not "constitute precedent or be binding upon any court." Although it is posted on the internet, this opinion is binding only on the parties in the case and its use in other cases is limited. R. 1:36-3.

SUPERIOR COURT OF NEW JERSEY
APPELLATE DIVISION
DOCKET NO. A-1159-24

RINGWOOD EDUCATION
ASSOCIATION,

    Plaintiff-Respondent,

v.

RINGWOOD BOARD OF
EDUCATION,

    Defendant-Appellant.

_____

Argued December 16, 2025 – Decided July 20, 2026

Before Judges Firko, Perez Friscia and Vinci.

On appeal from the Superior Court of New Jersey, Law Division, Passaic County, Docket No. L-0856-23.

Mark A. Wenczel argued the cause for appellant (Cleary Giacobbe Alfieri Jacobs LLC, attorneys; Mark A. Wenczel, of counsel and on the briefs; Kyle C. McLester, on the briefs).

Seth B. Kennedy argued the cause for respondent (Oxfeld Cohen PC, attorneys; Sanford R. Oxfeld, of counsel and on the brief; Ethan Felder, on the brief).

PER CURIAM

Defendant Ringwood Board of Education (the Board) appeals from the November 13, 2024 order granting plaintiff Ringwood Education Association's (the Association) motion for summary judgment. The court found the Board's District Policy 3233 (Policy 3233), which bars the display of political lawn signs inside faculty vehicles while in a school parking lot was unconstitutionally overbroad. We disagree and reverse. However, we affirm the order insofar as it did not consider Christopher Romano's First Amendment retaliation claim.

I.

We derive the following facts from the summary judgment motion record viewed in the light most favorable to the Board. Templo Fuente De Vida Corp. v. Nat'l Union Fire Ins. Co. of Pittsburgh, 224 N.J. 189, 199 (2016).

A.

Policy 3233 and the Board Candidate Lawn Signs

N.J.S.A. 18A:11-1(c) empowers boards of education to "[m]ake . . . rules . . . for its own government and . . . management of the public schools and public school property of the district." Pursuant to this statute, on December 6, 2021, the Board adopted Policy 3233 entitled, "Political Activities," as recommended by a school policy manual consultant. On June 27, 2022, the Board revised

A-1159-24

Policy 3233, as recommended by the consultant, to replace the term "chosen freeholders" with "county commissioners," and to make other changes not challenged on appeal.

In pertinent part, Policy 3233 provides:

> The Board establishes the following guidelines to govern teaching staff members in their political activities:
>
> 1.      A teaching staff member shall not engage in political activity on school grounds unless permitted in accordance with Board Policy No. 7510,[1] Use of School Facilities and/or applicable Federal and State laws;
>
> 2.      A teaching staff member shall not post political circulars or petitions on school grounds nor distribute such circulars or petitions to students

---

[1] Policy 7510 outlines the following limitations on use:

> B.      During the regular school year, school facilities are available for use only during the hours of 4:00 p.m. and 10:00 p.m. School facilities are not available for use during the school or for any use that may interfere with the school district's education or extra-curricular program.
>
>                    . . . .
>
> E.      The use of school facilities will not be granted for the advantage of any commercial or profit-making organization or partisan political activity, or any purpose that is prohibited by law.

3

nor solicit campaign funds or campaign workers on school grounds;

3.    A teaching staff member shall not display any material that would tend to promote any candidate for office on an election day on school grounds that are used as a polling place;

4.    A teaching staff member shall not engage in any activity in the presence of students while on school grounds, which is intended and/or designated to promote, further or assert a position(s) on labor relations issues.

[(Footnote added).]

Also, the Board enacted District Regulation 3233 (Regulation 3233), which prohibits in relevant part:  "Any activity in the presence of students while on school property, which activity is intended and/or designed to promote, further or assert a position(s) on labor relations issues."

In October 2022, the Board received a complaint stating that teachers were placing campaign lawn signs of local Board candidates under their car windshields while parked in the Ryerson Middle School parking lot during the school day.  On October 14, 2022, Dr. Nicholas Bernice, the Board's Superintendent, sent an email to all members of the school staff advising that the practice of placing Board candidate lawn signs under the windshield of their

A-1159-24

cars on school property during the school day constituted political activity in violation of Policy 3233. The email stated:

> It has come to my attention that some employees have placed campaign signs under the windshield of cars parked on school property during the school day. The practice of prominently displaying local campaign signs in car windows while a vehicle [is] parked in the school parking lot constitutes political activity in violation of [Policy] 3233. Accordingly, I am asking that this practice immediately cease.
>
> In addition to constituting a violation of [Policy] 3233, the prominent placement of such signs in a vehicle, while it is parked on school grounds, interferes with the orderly and efficient operation of the school and constitutes activity that is part of a predominately personal, not public nature.
>
> The continued placement of such signs in car windshields or windows is not protected political speech or conduct under the law, and continuing the activity shall have an individual disciplinary response.

The Association's President, Eileen Camporeale, testified at her deposition that she participated in this practice of displaying campaign lawn signs of Board candidates under her windshield, but stopped pursuant to Dr. Bernice's email. She also testified that the Board's enforcement of Policy 3233 through Dr. Bernice's email was selective because there were instances where Policy 3233 was violated and the Board failed to enforce the Policy. Camporeale described two instances where the Board failed to enforce the

A-1159-24

Policy. First, she described during back-to-school night in 2022, a Board candidate's campaign manager stood outside the front doors of the school handing out campaign flyers. According to Camporeale, official action was not taken. The second incident occurred in the Fall of 2022, where Camporeale testified she saw a Board campaign manager and members on his ticket in the parking lot of Hewitt Elementary School handing out flyers after Board meetings.

In a follow-up email, Dr. Bernice stated his previous email was "based upon an objective application of [Policy 3233]." He also explained the currently enacted policies "permit the district to regulate the efficient operation of the schools and to avoid the potential disruption to the efficient operation of the schools caused by teachers prominently displaying political signs in car windshields . . . to subject students and unwilling adults involuntarily to political speech [or] activity." Dr. Bernice also stated that the policies "do not prohibit teachers from expressing their political opinions to other willing adults when no students are present and do not prohibit teachers from engaging in political speech [or] activities off school property during non-working hours."

6

On October 19, 2022, the Association's attorney asked Dr. Bernice to publicly withdraw his emails because the application of Policy 3233 was "overly broad, illegal and thus unenforceable." The Association's attorney explained:

> Policy 3233 lists four separate prohibitions; and all of these prohibitions apply only to teaching staff members. In other words, a contractor or a parent or a member of the community, could with impunity and without violating said policy do precisely what the policy purports to prohibit the teaching staff from doing. When seen in this light, it becomes immediately clear that the policy, both in the abstract and in its application, unfairly and wrongfully violates the First Amendment rights of the teaching staff.

Relying on Green Township Education Association v. Rowe, 328 N.J. Super. 525 (App. Div. 2000), the Association's attorney described the opinion as a "robust statement endorsing the First Amendment rights of teaching staff; except when they are in a classroom with a captive audience." On October 20, 2022, the Board's attorney responded maintaining Policy 3233 and Policy 7510, "prohibit teachers from engaging in political activity on school property during the school day, when students and unwilling adults will be subjected involuntarily to political speech/activity," which are constitutional under Green.

7

B.

Romano's First Amendment Retaliation Claim

Romano was employed as a teacher by the Board for the 2021-22 to 2023-24 school years.  In the 2021-22 and 2022-23 school years, Romano taught seventh grade math.  During his employment, Romano parked his truck in the school parking lot, with decals along the windows containing the following Second Amendment language:  "We the People, [a] well-regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."

On December 14, 2022, a parent of a middle school student sent an email complaining about the decals on Romano's truck to district administrators, including the school principal, Dr. Jennifer Wirt, and interim superintendent, Dr. Kathryn Fedina.  The parent's child had previously been suspended for threatening another student, and the parent complained the school was sending inconsistent messages by allowing Romano's car to display these decals.  The email read:

> Today, at Ryerson [Middle] School, a red truck . . . was parked amongst faculty and staff parking, and that truck had window decals . . . reciting a portion of the Second Amendment promoting guns.

A-1159-24

I find this display to be vulgar and inappropriate on school grounds. [While this] material is on some level protected free speech, such speech is clearly supporting and promoting guns and does not belong on the grounds of any middle school.

. . . .

To be consistent with the punishment my [child] received, I ask that the owner of this vehicle is instructed to remove the decals or drive a different vehicle to Ryerson.

If you wish, feel free to consider this email as an official complaint.

On December 19, 2022, Dr. Fedina responded that the Ringwood School District could not require Romano to remove the decals because their content was protected by the First Amendment. After informing Romano of his First Amendment right to keep the decals on his truck, Dr. Fedina and Dr. Wirt asked, but did not require, Romano to temporarily park his vehicle in a less trafficked area of the parking lot or cover the decals to help deescalate the situation with the parent. However, the parent's complaints persisted.

On December 22, 2022, Romano contacted his union representative who advised him to disregard the meeting and the administrators' requests regarding his truck window decals and parking location. After the meeting, Camporeale explained to Dr. Fedina the potential issue that could result from Dr. Wirt's

A-1159-24

meeting with Romano because it occurred soon after Dr. Bernice's email invoking Policy 3233. As a result, the administrators also told Romano to disregard any request made in the December 19, 2022 meeting entirely.

In April 2023, the Board notified Romano that his contract would not be renewed for the 2023-24 school year. In May 2023, however, after a Donaldson[2] hearing, the Board renewed Romano's contract and was assigned to teach sixth grade math instead of seventh grade math based on a decrease in his summative evaluations.

Romano believed the decline in summative evaluations, the initial nonrenewal of his contract, and assignment to teach sixth grade math were retaliatory in response to his decision to disregard the decal requests and his negative interactions with Dr. Wirt. The Board posited Romano's non-renewal and new assignment were due to a decrease in his summative evaluation reports for his teaching performance during that period.

---

[2] Under Donaldson v. Bd. of Ed. of City of N. Wildwood, 65 N.J. 236 (1974), nontenured teachers are permitted to request a hearing where administrators are obligated to provide reasons for their decision not to renew their contract.

The Litigation

On January 27, 2023, the Association filed a single-count verified complaint for declaratory judgment against the Board seeking a ruling that its application of Policy 3233 is overly broad and in violation of the teaching staff's First Amendment rights. The Association alleged that under our decision in Green, any restriction on the "free market of ideas," which does not limit itself to a classroom setting with a captive audience, is "fundamentally suspect." The Association alleged Policy 3233 is overly broad because it is applied only to teaching staff and not to anyone else situated on Board property.

The Board filed an answer generally denying the allegations of the verified complaint pertaining to Policy 3233. The Board averred Policies 3233 and 7510 are applied "to all individuals while they are on school grounds," not only teaching staff members.

Following a period of discovery, the Board moved for summary judgment seeking dismissal of the Association's verified complaint. The Association filed a cross-motion for summary judgment seeking a declaration that Policy 3233 is unconstitutionally overbroad and infringes on the teaching staff's First Amendment rights. For the first time, the Association raised a retaliation claim

11

on Romano's behalf and contended the Board violated his First Amendment rights by retaliating against him for refusing to remove the truck decals.

On November 13, 2024, the court conducted oral argument on the motions. At oral argument, the Association limited its argument to the facial and applied challenges to Policy 3233 and withdrew Romano's retaliation claim as moot.

Following oral argument, the court denied the Board's motion for summary judgment and granted the Association's cross-motion for summary judgment. In its statement of reasons accompanying the order, the court applied our holding in Green. The court found Policy 3233 was unconstitutional both facially and as applied because it was not limited to "the school facility or classroom," where students are present, and the practice of teachers displaying lawn signs in their vehicles "did not equate to job-related speech."

However, the court granted the Board's motion regarding Romano's First Amendment retaliation claim because his cause of action was not included in the verified complaint and on the basis "parties cannot introduce new claims at the summary judgment stage," citing Carlini v Curtiss-Wright Corp., 71 N.J. Super. 101, 109 (App. Div. 1961). A memorializing order was entered. This appeal followed.

Before us, the Board argues the court erred in granting summary judgment in favor of the Association because Policy 3233 is not unconstitutionally overbroad and does not infringe on the teaching staff's First Amendment Rights. The Board seeks affirmance of the dismissal of Romano's First Amendment retaliation claim, which the Association does not challenge on appeal.

II.

We review a grant of summary judgment de novo, applying the same standard as the trial court. Samolyk v. Berthe, 251 N.J. 73, 78 (2022). The standard requires us to "determine whether 'the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact challenged and that the moving party is entitled to a judgment or order as a matter of law.'" Branch v. Cream-O-Land Dairy, 244 N.J. 567, 582 (2021) (quoting R. 4:46-2(c)). "Summary judgment should be granted . . . 'against a party who fails to make a showing sufficient to establish the existence of an element essential to [a] party's case, and on which that party will bear the burden of proof at trial.'" Friedman v. Martinez, 242 N.J. 449, 472 (2020) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986)). We do not defer to the trial court's legal analysis or

statutory interpretation. RSI Bank v. Providence Mut. Fire Ins. Co., 234 N.J. 459, 472 (2018); Perez v. Zagami, LLC, 218 N.J. 202, 209 (2014).

## A.

The Board contends Policy 3233 is constitutional as written and in its application to teachers. The Board argues the court erred because it "misconstrued" our First Amendment precedent in Green warranting reversal. The Board's position has merit.

## The First Amendment

"The First Amendment to the United States Constitution . . . directs that 'Congress shall make no law . . . abridging the freedom of speech.'" Usachenok v. State, Dep't of Treasury, 257 N.J. 184, 195 (2024) (quoting U.S. Const. amend. I). This provision was made applicable to the states by the Fourteenth Amendment. U.S. Const. amend. XIV, § 1. "The 'State Constitution's free speech clause is generally interpreted as co-extensive with the First Amendment.'" Usachenok, 257 N.J. at 195 (quoting E & J Equities, LLC v. Bd. of Adjustment of Franklin, 226 N.J. 549, 568, (2016)). "As a result, principles of federal constitutional law, in general, help guide our analysis." Ibid.; see also Hamilton Amusement Ctr. v. Verniero, 156 N.J. 254, 264 (1998).

Article I, Paragraph 6 of New Jersey's Constitution provides that "[e]very person may freely speak, write and publish his sentiments on all subjects, being responsible for the abuse of that right. No law shall be passed to restrain or abridge the liberty of speech or of the press." N.J. Const. art. I, ¶ 6. New Jersey's free speech protections are considered "broader than practically all others in the nation." Green Party v. Hartz Mountain Indus., Inc., 164 N.J. 127, 145 (2000).

"The protections afforded under the First Amendment not only protect verbal speech but also non-verbal speech, characterized as 'expressive conduct.'" Dempsey v. Alston, 405 N.J. Super. 499, 514 (App. Div. 2009) (quoting R.A.V. v. St. Paul, 505 U.S. 377, 382 (1992)). "To qualify as expressive conduct protected by the First Amendment, the actor must have '[a]n intent to convey a particularized message . . . and in the surrounding circumstances the likelihood [must be] great that the message would be understood by those who viewed it.'" Ibid. (alterations in original) (quoting Spence v. Washington, 418 U.S. 405, 410-11 (1974)).

However, "[t]he rights of free speech do not mean that everyone with opinions or beliefs to express may address a group at any public place and at any time." Hurwitz v. Boyle, 117 N.J. Super. 196, 201 (App. Div. 1971). Specifically, "the government as employer has far broader powers in regulating

15

speech than does the government as sovereign." Green, 328 N.J. Super. at 534 (citing Waters v. Churchill, 511 U.S. 661, 671 (1994)). "Constitutional review of government employment decisions thus rests on different principles than review of speech restraints imposed by the government as they apply to the general citizenry." Ibid. (citing Waters, 511 U.S. at 674). However, in the context of public-school employment, "[t]eachers are not relegated to 'a watered-down version' of constitutional rights." Ibid. (quoting Karins v. City of Atlantic City, 152 N.J. 532 (1998)).

The United States Supreme Court adopted a balancing test for when the government acting as an employer can regulate speech without violating the First Amendment. Pickering v. Bd. of Educ., 391 U.S. 563, 573-74 (1968). In Pickering, the Court held the school's disciplinary action against a public school teacher for writing a letter to a local newspaper to criticize the board of education and superintendent's failure to raise adequate revenue was unconstitutional because it addressed a matter of public concern and the teacher's interests outweighed the government's interests as the employer. Id. at 568-73.

The Pickering test instructs courts to perform a two-step process. Id. at 588. First, the court asks the threshold question of whether the employee's

prohibited speech is a matter of public concern. Ibid. If the prohibited speech is a matter of public concern, then the court performs the second step, which is a balancing test weighing whether the State's interest, as an employer, outweighs the interest of the employee as a citizen to comment on matters of public concern. Id. at 568. When the interests of the employee as a citizen to comment on matters of public concern outweigh the State's interest, as an employer, to promote legitimate governmental objectives then the regulation on speech is unconstitutional. Ibid.

In Green, we addressed these First Amendment principles in the context of the Green Township Education Association's (the Green Township Association) declaratory judgment against the Green Township Board of Education's (the Green Township BOE) policies as violative of the First Amendment. 328 N.J. Super. at 528. The policy, known as the "conflict-of-interest" policy, in question read:

> All employees are prohibited from active campaigning on school property on behalf of any candidate for local, state or national office or actively promoting any opinions on voting issues.
>
> All employees working in a facility of this district which is used as a polling place are prohibited on an officially declared election day from displaying any materials that would promote the election of any candidate or opinions on voting issues.

17

All employees are prohibited from engaging in any activity with students during performance of the employees' duties, which activity is intended or designed to promote, further or assert a position on any voting issue, board issue, or collective bargaining issue.

[Id. at 529.]

After the policy's enactment, "teachers began displaying buttons reading 'NJEA[3] SETTLE NOW' while in the presence of students in the school building," referencing the ongoing collective bargaining negotiations between the parties. Ibid. Applying the conflict-of-interest policy, the superintendent of schools for the Green Township BOE, "directed the Association's members to refrain from wearing the buttons in the presence of students while on school premises." Ibid. As a result, the Association filed suit. Ibid. The court entered judgment in favor of Green Township BOE and found the conflict-of-interest policy was not overbroad, and therefore, not a violation of the teacher's First Amendment rights. Id. at 530.

On appeal, we considered the novel questions concerning the extent to which a governmental employer may restrict its employees' freedom of speech in the setting of the workplace. Id. at 528. Specifically, whether the Green Township BOE's conflict-of-interest policy or the Green Township BOE's

---

[3] NJEA stands for the New Jersey Education Association.

application of the conflict-of-interest policy to prohibit the teachers from wearing a button bearing the inscription "NJEA SETTLE NOW" while on school premises in the presence of students posed a "real" and "substantial" burden on constitutionally protected speech. Id. at 528-34.

We applied the Pickering balancing test and held the threshold question of public concern was satisfied because "educational policy and labor relations are undoubtedly subjects of public concern." Green, 328 N.J. Super. at 536. However, we noted the interest was not purely public, as "teachers obviously have a personal stake" or private interest in their own collective bargaining agreement. Ibid. Further, we found the government as employer had an interest in the teacher's function as an employee which "must be to educate his or her students and not to advance his or her self-interest." Ibid.

In performing the balancing test, we first held the first and second provisions of the policy were facially overbroad and unconstitutional because the teachers' interests outweighed the school's interests for several reasons. Id. at 536-37.[4] Generally, the policy's "prohibitions [were] not invariably confined to the setting of the school facility or classroom" or "always limited to situations

---

[4] The court did find the third provision constitutional, which read "barring teachers in the presence of students, from 'promot[ing] . . . a position on any . . . collective bargaining issue,'" constitutional. Ibid. (alteration in original).

in which students are present." Id. at 536. Specifically, we noted the first clause of the policy prohibited "(1) '[a]ll employees' from (a) 'active campaigning,' or (b) 'actively promoting any opinions on voting issues,' (2) on school property." Ibid. (alteration in original).

We reasoned that prohibiting "active campaigning" applied to "employee conduct outside the presence of students" and when "[r]ead literally, the clause bars employees from using their lunch breaks or free periods to express their opinions to other willing adults even if no students are present" and "precludes teachers from speaking at board of education meetings conducted at the school facility." Ibid. Moreover, we also observed that the second clause of the policy that prohibited "(1) '[a]ll employees . . . working in a facility of [the] district' (2) 'which is used as a polling place,' from (3) 'displaying any materials that would promote' (a) 'the election of any candidate,' or (b) 'opinions on voting issues,' (4) 'on an officially declared election day'" was overbroad. Ibid. (alterations in original). We determined the second clause was overbroad because it included prohibitions on "teachers from passing out political leaflets off school property during non-working hours." Id. at 536-37.

In conclusion, we held "[the policy] is susceptible to a construction that its reach is everywhere, and encompasses the most benign activities." Id. at 537.

However, we provided a roadmap stating, "a carefully worded protocol tailored to prohibiting teachers from promoting positions on labor relations issues in the presence of students while on school property could pass constitutional muster." Ibid. (citing Tinker v. Des Moines Indep. Cmty. Sch. Dist., 393 U.S. 503, 514 (1969)).

Notwithstanding, we found the policy was facially overbroad and unconstitutional under the First Amendment, but the policy was constitutional as applied to the teachers. Id. at 538. Specifically, we held the school's prohibition on teachers from wearing the "NJEA SETTLE NOW" buttons during the school day was constitutional because the government interest outweighed the teacher's interest when the regulation was limited to the classroom setting. Id. at 539. And therefore, "the [Green Township BOE] could reasonably have concluded that such displays carry a risk of interfering with the performance of this job." Ibid.

Facial Analysis of Policy 3233

We first address Board's argument that the court improperly found Policy 3233 unconstitutionally violated the First Amendment because the Policy is facially overbroad. If the government attempts to regulate speech by statute or policy, the court allows for facial invalidation under the First Amendment, as

21

"[w]e do not require that injury shall be experienced as a condition for suit," but "the prospect of wrongful conduct must be real and not fanciful." Anderson v. Sills, 56 N.J. 210, 220 (1970). The reasoning is "an overly broad statute may chill or stifle constitutionally protected speech . . . [a]nd if the statute is not applied or enforced, the courts are none the wiser and the right of expression is nonetheless impaired." Green, 328 N.J. Super. at 532.

In analyzing facial challenges, we have held "[f]acial invalidation of a statute, regulation or governmental protocol 'is, manifestly, strong medicine' that 'has been employed . . . sparingly and only as a last resort.'" Id. at 531 (quoting Binkowski v. State, 322 N.J. Super. 359, 375 (App. Div. 1999)). Therefore, in order to find a statute facially overbroad and unconstitutional under the First Amendment, "[t]he [Supreme] Court has emphasized that 'the overbreadth of a statute must not only be real, but substantial as well, judged in relation to [its] plain legitimate sweep.'" Id. at 533 (third alteration in original) (quoting Broadrick v. Oklahoma, 413 U.S. 601, 615 (1973)). Furthermore, the Court has provided "[f]acial overbreadth has not been invoked when a limiting construction has been or could be placed on the challenged statute." Ibid. (quoting Broadrick, 413 U.S. at 613).

A-1159-24

Moreover, "[t]he overbreadth doctrine 'involves substantive due process considerations concerning excessive governmental intrusion into [constitutionally protected] areas.'" Id. at 531 (alterations in original) (quoting Karins, 152 N.J. at 544). "The standard is not whether the law's meaning is sufficiently clear, but whether the reach of the law extends too far in fulfilling the State's Interest." Ibid. (quoting Karins, 152 N.J. at 544). "So posited, the issue is whether the prohibitions contained in the protocol embrace subjects beyond their proper reach." Ibid.

On appeal, the Board argues that Policy 3233 is constitutional and distinct from the Green's "conflict-of-interest" policy because "Policy 3233 does not impose a blanket prohibition on political activity at all times." Instead, the Board contends Policy 3233 prohibits teachers from using the school grounds during the school day for "partisan political purposes" while "in the presence of students" and prohibits activity "intended to promote, further, or assert a position(s) on labor relations issues," as Green permits. Specifically, the Board contends Policy 3233 does not prohibit teachers from "discussing politics between other willing adults in private on school grounds," unlike the policy in Green. Further, the Board maintains Policy 3233 allows teachers to post

political circulars off school grounds and merely prohibits their ability to do so while on school grounds.

The Board points out Policy 3233 was specifically tailored to comply with the mandate of Green, which requires a policy tailored to prohibiting teachers from engaging in political activity in the presence of students while on school property could pass constitutional muster. Id. at 537. The Board avers that Policy 3233 does not facially "single out" teachers because Policies 3233 and 9150[5] apply similar political restrictions on the school grounds to all employees and members of the public.

The Association counters that the court properly found Policy 3233 overbroad and an unconstitutional infringement on the First Amendment rights of the teachers based on the precedents established in Pickering and Green. The Association argues that Policy 3233 suffers from the "same constitutional defects" as the Green policy because it prohibits the use "of school grounds and school time" for partisan political purposes and "proscribes a teacher from campaigning for any candidate for public office outside of the school building."

---

[5] In pertinent part, Policy 9150 provides: "All visitors to the schools must obey . . . regulations designed to ensure orderly operation of the school."

 A-1159-24

Based upon our de novo review, we conclude Policy 3233 is not unconstitutional or overbroad. The matter under review involves a scenario that we did not squarely address in <u>Green</u>—the extent to which the Board can prohibit speech that, while outside the classroom, nevertheless occurs on school property and is presumably routinely witnessed by students.

Here, Policy 3233 does not implicate the same concerns present in <u>Green</u>—that a literal reading would preclude speech between teachers on lunch breaks or prevent teachers from speaking at board meetings or from distributing political literature when not on school property. On the contrary, the prohibition under Policy 3233 applies to speech occurring within the school grounds in a location accessible to students. Thus, Policy 3233 applies to speech "in the presence of students while on school property," which we specifically held in <u>Green</u> could be prohibited without running afoul of the overbreadth doctrine. The fact that the speech, via a sign displayed in a vehicle, is less direct than a statement made in a classroom, does not mean it is unconstitutionally overbroad.

We are satisfied that prohibiting teachers from displaying lawn signs in the school's parking lot is akin to disallowing members of the public from erecting political lawn signs on school grounds, which the Board could certainly and presumably prohibits. By preventing speech on school property that can be

viewed by students, Policy 3233 does not significantly limit teachers' speech beyond that enjoyed by the general public. Consequently, precluding the display of lawn signs on school property does not "impose[] a 'real' and 'substantial' burden on constitutionally protected conduct," which we noted in <u>Green</u> must be avoided. <u>Id.</u> at 534. Therefore, we conclude the court erred in its interpretation of <u>Green</u> and the scope of the speech prohibitors it found unconstitutional and overbroad under the First Amendment.

<u>As Applied Challenge to Policy 3233</u>

Next, the Board argues the court erred in its finding the Board violated the teachers' First Amendment rights through its application of Policy 3233. The Board maintains the court improperly determined Dr. Bernice's email requiring teachers to cease displaying Board candidate campaign lawn signs in car windows on school property during the school day was an inappropriate application of Policy 3233. The Board contends the court erred in finding such application unconstitutional on the basis the teachers displaying the lawn signs was not in the school facility or classroom, and thus, there was no "captive audience."

Here, the Board was clearly regulating "job-related conduct." In particular, the Board had the authority to prevent students from being subject to

26

walking by partisan political campaign signs of their teachers on their way into school every morning. Further, these signs were not "innocuous like a bumper sticker," but rather prominently displayed by teachers. The Board points out a Board election is "undoubtedly political, and would typically be a matter of public concern," but teachers are motivated by their "private connection to the elections" because the Board engages in negotiations with the Association that dictates their salary and benefits.

In considering this issue, it is clear that the posting of lawn signs was not exclusively the result of teachers wanting to express their views about a matter of public concern but was predominately job-related in seeking to promote their self-interest in the context of labor and other negotiations. Under Pickering, the Board "had an adequate justification for treating [teachers] differently from any other member of the general public." 391 U.S. at 568. We conclude the Board's actions in implementing and enforcing Policy 3233 were justified, warranting reversal.

## B.

Finally, the Board seeks affirmance of the court's grant of summary judgment in its favor dismissing Romano's First Amendment retaliation claim. The Association does not rebut this argument, and at oral argument on the

27

summary judgment motions, conceded Romano's retaliation claim was moot. Therefore, there is no need for us to address this point.

Reversed in part and affirmed in part. We do not retain jurisdiction.

I hereby certify that the foregoing is a true copy of the original on file in my office.

M.C. Harley

Clerk of the Appellate Division

28